# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**
　　　　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　　**Case No. 06-C-0715**

**MANAGEMENT HOSPITALITY OF
RACINE, INC., et al.,**
　　　　　　　　**Defendants.**

---

## DECISION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") brings this action alleging that three servers employed at an IHOP franchise in Racine, Wisconsin (the "Racine IHOP") were sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Defendant Management Hospitality of Racine, Inc. ("MHR") owned the Racine IHOP and was itself owned by defendant Salauddin Janmohammed. Janmohammed's wife, Victoria Janmohammed, owned defendant Flipmeastack, Inc., which provided management services to MHR. The EEOC alleges that defendants allowed a hostile work environment to exist at the Racine IHOP and fired one of the servers, Katrina Shaw, in retaliation for complaining about sexual harassment. Defendants now move for partial summary judgment seeking dismissal of the EEOC's retaliation claim and its claim for punitive damages.

## I. BACKGROUND

The facts, taken in the light most favorable to the EEOC, are as follows. In early 2005, defendants hired Michelle Dahl to manage the Racine IHOP. Dahl told the Racine

IHOP that she would accept the position only if the restaurant also hired Rosalio Gutierrez to be one of her assistant managers. The restaurant complied. Nadia Del Rio was the restaurant's other assistant manager.

Once he was hired, Gutierrez began sexually harassing female servers, including Shaw, Rachel Schreier, Michelle Powell and Tashia Petrokonis. In April 2005, Powell complained about the harassment to Dahl and also told Del Rio about it. Dahl told Powell that she would "take care" of it but did nothing, and the harassment continued. Gutierrez's harassment of Schreier caused Schreier to miss work three to five times per month. Schreier states that she feared that if she complained, she would lose her job and that because Dahl had not acted on others' complaints, she thought that complaining would be futile. Eventually, Schreier complained to Dahl, but the harassment continued.

About a year before Gutierrez began harassing Shaw, Shaw witnessed her former general manager, Charles Hecker, sexually harass another server, Christina. Shaw complained about the harassment to Flipmeastack's district manager, Steve Smith, but Smith did nothing, saying that he had no time to investigate. Subsequently, Hecker fired Christina. He also treated Shaw harshly, causing her to think he wanted her to resign. Shaw reported Hecker's conduct to the IHOP franchisor, which told Shaw to report the matter to Smith. Eventually, the Racine IHOP fired Shaw for insubordination, although Shaw suspects that it was in retaliation for complaining about Hecker. Shaw then took a job at an Open Pantry but subsequently returned to the Racine IHOP.

Soon after Shaw commenced her second term of employment at the Racine IHOP, Gutierrez began to sexually harass her, and when she resisted, he assigned her extra work. Shaw complained to Del Rio and also heard Schreier tell Del Rio about other

2

instances of harassment by Gutierrez. Del Rio rolled her eyes, accused Schreier and Shaw of lying, and did nothing. Shaw then reported the harassment to Dahl, who responded that the matter was not her concern. One week later, Dahl fired Shaw.

The parties have different views of the circumstances leading to Shaw's second termination. The EEOC contends that Shaw was fired in retaliation for complaining about Gutierrez, whereas defendants assert that she was fired because she violated the restaurant's coupon policy and because she said she wanted to return to her job at Open Pantry. Defendants state that the coupon policy prohibited on-duty servers from possessing IHOP coupons so that they would not give them to customers and thereby enable them to pay a discounted price. Defendants viewed this practice as a form of theft. They also suspected servers of not telling customers about the coupons, charging them full price, and then applying coupons to orders and pocketing the savings. Shaw states that the coupon policy did not bar servers from possessing coupons but only from using them to give improper discounts.

Defendants contend that on the day she was fired, Shaw was frustrated because she was waiting on customers who were angry because other servers had ignored them. They state that Shaw complained to Dahl and Gutierrez, who were seated nearby, that Shaw and Dahl exchanged words, and that Dahl questioned Shaw about customers at another table who Dahl thought had left without paying. Shaw responded that they had paid and opened her order book to show Dahl the check and the money. Dahl was alarmed that Shaw had the money, because customers were supposed to pay at the cash register. Dahl also noticed a sheet of coupons in Shaw's order book and that one had been ripped out. She concluded that Shaw intended to use the coupon to reduce the

3

customers' bill and keep the difference.  Shaw became increasingly agitated and stated that she should have stayed at Open Pantry, and Gutierrez told her that if she wanted to return to that job she should.  Dahl then terminated Shaw on the spot for violating the coupon policy and for her remark about wanting to return to Open Pantry.

Shaw's version of the incident is that she was serving three tables of angry customers that other servers had ignored and that Dahl and Gutierrez were sitting nearby and ignoring the problem.  Shaw asked them to make sure that all servers understood their table assignments, and Dahl became angry and commented on a mistake Shaw had made earlier that day.  Out of frustration, Shaw said to a nearby server that she should have stayed at her old job, and Gutierrez jumped in, stating "You want your gas station job back so bad, then get the f--- out."  Shaw began to cry and told Gutierrez that she needed her job, but Gutierrez did not relent.  Shaw also denies violating the coupon policy.  She states that two weeks before, she found a coupon book that a customer had left behind.  She distributed some coupons to customers but kept no money, and when Gutierrez told her to stop distributing coupons, she did.  She kept the remaining coupons in her order book and forgot about them.  She states that the franchise generally warned servers who committed infractions such as tardiness, insubordination or giving customers free drinks twice before firing them.

After her firing, Shaw hired an attorney who commenced an investigation of her harassment claims, which included interviewing servers.  Del Rio informed MHR and Flipmeastack of the investigation, which led Smith to begin his own investigation.  Smith concluded that Gutierrez had harassed servers and that Dahl had failed to take appropriate

4

action.  On May 25, 2005, Smith terminated Dahl.  Gutierrez had resigned three days previous, apparently after discovering that his conduct was the subject of an investigation.

## II.  DISCUSSION

Summary judgment is appropriate only when the materials before the court demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Miller v. American Airlines, Inc., 525 F.3d 520, 523 (7th Cir. 2008).

### A.      Retaliation

Defendants first contend that they are entitled to summary judgment on the EEOC's claim that Shaw's termination was retaliatory.  Title VII prohibits an employer from retaliating against an employee for complaining about sexual harassment.  42 U.S.C. § 2000e-3(a).  To survive summary judgment on a retaliation claim, a plaintiff may utilize the "direct" or "indirect" method of proof.  See, e.g., Gates v. Caterpillar, Inc., 513 F.3d 680, 686 (7th Cir. 2008).  Under the direct method, she must present sufficient evidence to enable a reasonable factfinder to conclude that (1) she engaged in a protected activity, (2) the defendant subjected her to an adverse employment action, and (3) a causal connection existed between the two events.  Id.  Under the indirect method, she must show that she opposed the defendant's discrimination and, unlike any similarly situated employee who did not oppose discrimination, was subjected to an adverse employment action even though her job performance was satisfactory.  Id. at 689.

In the present case, the EEOC relies primarily on the direct method of proof.  But in their reply brief, defendants suggest that the EEOC relies exclusively on the indirect

method, stating that "[t]he EEOC concedes that it has no direct evidence of retaliatory intent or causation and must demonstrate a triable issue of fact using the indirect method of proof." (Reply Br. at 2 n.1.) Although the EEOC does not explicitly rely on the direct method, it nevertheless does so unmistakably – citing the elements of the direct method and discussing the evidence of a causal connection between Shaw's complaints and her termination (Br. in Opp. at 23). Perhaps defendants mean that the EEOC has no direct, as opposed to circumstantial, evidence of causation. To the extent that a clear line can be drawn between direct and circumstantial evidence, see Sylvester v. SOS Children's Vills. Ill., Inc., 453 F.3d 900, 903 (7th Cir. 2006), defendants state correctly that the EEOC has no direct evidence of causation, such as an admission by Dahl that she fired Shaw in retaliation for complaining about harassment. However, in utilizing the direct method of proof, a plaintiff may rely exclusively on circumstantial evidence. Gates, 513 F.3d at 686; Treadwell v. Office of the Ill. Sec'y of State, 455 F.3d 778, 781 (7th Cir. 2006); Sylvester, 453 F.3d at 902-05. "Direct method" should not be confused with "direct evidence."

I conclude that via the direct method, the EEOC has presented sufficient evidence to warrant a trial on her retaliation claim. Defendants do not dispute that plaintiff engaged in protected activity (complaining about sexual harassment) and that she suffered an adverse employment action (termination). And the EEOC presents sufficient circumstantial evidence to allow a reasonable jury to conclude that Shaw was terminated for complaining about sexual harassment. The EEOC shows that defendants terminated Shaw shortly after she complained to Dahl about Gutierrez's harassment. According to Shaw (whose testimony must be credited for purposes of this motion), she reported the harassment to Dahl on March 27, 2005, and Dahl fired her on April 3, 2005. Although temporal proximity

6

alone is not usually enough to satisfy the plaintiff's burden to establish causation, <u>Stone v. City of Indianapolis Pub. Utils. Div.</u>, 281 F.3d 640, 644 (7th Cir. 2002), in the present case the EEOC provides additional evidence, namely that Dahl and Gutierrez looked out for one another (recall that Dahl told the Racine IHOP that she would manage the restaurant only if Gutierrez was her assistant manager), making it reasonable to infer that Dahl wanted to protect Gutierrez from Shaw's accusations.[1]  A jury could reasonably infer that when Dahl caught Shaw with coupons and heard her remark about her old job, she saw an opportunity to fire her and avoid the problem presented by her accusations against Gutierrez.  In other words, a jury could reasonably conclude that the coupon violation and the Open Pantry comment amounted to a pretext for terminating Shaw.

As discussed, the testimony as to the content of the coupon policy is conflicting.  Shaw testified that the policy did not bar mere possession of coupons, but only actual misuse, i.e., passing coupons out to customers.  (Shisler Dep. at 279:9 to 280:18.)  A jury might also agree with this view and could also conclude that termination was an excessively harsh punishment for Shaw's Open Pantry remark and that Dahl imposed this sanction to silence Gutierrez's accuser.  Indeed, MHR's district manager testified that the restaurant normally employs a progressive discipline system, under which it terminates an employee only after three violations.  (Smith Dep. at 232.)  Defendants offer no noninvidious reason why Dahl did not honor the "three strikes" rule.  Finally, even if the

---

[1]Even in the absence of additional evidence, the adverse employment action took place "on the heels of protected activity" – that is, within seven days – such that this might be a case in which temporal proximity is enough to establish causation.  <u>See, e.g.</u>, <u>Mobley v. Allstate Ins. Co.</u>, 531 F.3d 539, 549 (7th Cir. 2008). However, I need not decide this question because the EEOC does not rely on temporal proximity alone.

7

coupon policy barred mere possession of coupons, where (as here) a plaintiff establishes a prima facie case of causation, "[t]he fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" <u>Stone</u>, 281 F.3d at 643. Accordingly, the EEOC's retaliation claim must proceed to trial.[2]

## B.     Punitive Damages

A Title VII plaintiff is entitled to punitive damages if her employer engages in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). "Malice" or "reckless indifference" do not require "a showing of egregious or outrageous" conduct, but rather proof that the employer acted "in the face of a perceived risk that its actions [would] violate federal law." <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 535-36 (1999).

For purposes of the present motion, the named defendants do not dispute that some of their employees may have acted with malice or reckless indifference to federally protected rights. However, they point out that they cannot be found liable for punitive damages unless the state of mind of such employees can be imputed to them. To do so, the EEOC must show that a reasonable jury could find that the employees were managerial agents acting within the scope of their employment, <u>see, e.g.</u>, <u>Bruso v. United Airlines, Inc.</u>, 239 F.3d 848, 858 (7th Cir. 2001), and that the named defendants did not make good faith efforts to comply with Title VII. <u>Kolstad</u>, 527 U.S. at 545. For purposes of the present motion, defendants do not dispute the first of these elements but contend

_____

[2]Because the EEOC establishes a triable issue of fact under the direct method, I need not discuss the indirect method.

8

that they acted in good faith by establishing and implementing an antidiscrimination policy. Although creating an antidiscrimination policy is relevant to whether an employer makes a good faith attempt to comply with Title VII, such a policy "is not sufficient in and of itself to insulate an employer from a punitive damages award." Bruso, 239 F.3d at 858-59. Otherwise, "employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." Id.; accord Lampley v. Onyx Acceptance Corp., 340 F.3d 478, 482-83 (7th Cir. 2003); Hertzberg v. SRAM Corp., 261 F.3d 651, 663 (7th Cir. 2001).

In the present case, MHR contracted with Flipmeastack to provide, among other things, human resources services. Flipmeastack, in turn, established a sexual harassment and diversity policy for MHR. To implement the policy, Flipmeastack educated all MHR managers and assistant managers about sexual harassment and how to deal with complaints. In addition, MHR required its employees to watch a video about the policy and sign a statement acknowledging that they saw the video and understood the policy. The statement instructed employees to report violations of the policy to their "manager or company representative." (Shisler Dep. Ex. 31.) Defendants contend that these actions show that they made good faith efforts to comply with Title VII.

However, a reasonable jury could conclude that such efforts were insufficient to establish a good faith effort. This is so primarily because the persons responsible for addressing harassment complaints – the managers (Gutierrez, Del Rio and Dahl) and the company representative (Smith) – failed to fulfill their obligations under the policy. Gutierrez was himself a harasser, and a reasonable jury could conclude that Del Rio ignored complaints of harassment and that Dahl responded to the complaints by firing

9

Shaw. Further, although no complainant contacted Smith, a reasonable jury could conclude from his failure to respond to Shaw's previous complaint about Hecker that he did not take the sexual harassment policy seriously. To be sure, Smith eventually investigated the allegations against Gutierrez and fired Dahl, but he did so only after Shaw's lawyer had begun his own investigation.

Defendants might argue that they adopted the policy in good faith and cannot be held liable for their managers' failure to follow the policy. However, to be entitled to immunity from punitive damages based on their good faith efforts, defendants must show that they took steps to ensure that the policy was actually enforced. See, e.g., Bruso, 239 F.3d at 858-59. Here, defendants have shown only that they provided their employees with some initial training about the sexual harassment policy. They do not show that they took any steps to make sure that those entrusted with the policy's enforcement actually fulfilled their responsibilities. Nor have defendants shown that their policy contained a failsafe against the danger that a manager or company representative might ignore a harassment complaint. Defendants might, for example, have installed a hotline that employees could have used to contact upper management in the event that managers or the company representative ignored a complaint. Cf. Equal Employment Opportunity Comm'n v. V & J Foods, Inc., 507 F.3d 575, 579 (7th Cir. 2007) (suggesting that a hotline connecting employees to human relations department would be an effective means of enforcing anti-harassment policy). Indeed, defendants themselves suggest that such a failsafe was necessary. They point out that when they rehired Shaw, they showed her the sexual harassment video and instructed her to bring any sexual harassment complaints to Smith. They argue that if Shaw "had any issues with the requirement that complaints be made to

10

Smith, she should have said so then." (Reply Br. at 12.) But they provide no indication as to who, besides Smith, Shaw might have spoken to. And it appears that there was no one else.[3] However, as defendants acknowledge, there should have been someone else - namely, a person in upper management who was the last line of defense against a harassing or indifferent manager or company representative.

Perhaps in the Flipmeastack corporate structure, Smith _was_ upper management and thus was the last line of defense. If this were so, however, defendants may well incur punitive damages. If Smith had ultimate responsibility for the policy but did not enforce it in good faith, then defendants did not make good faith efforts to comply with Title VII. See Bruso, 239 F.3d at 860-61 (where "top management officials" disregarded antidiscrimination policy and failed to remedy known instances of harassment, employer could not rely on policy to avoid punitive damages); Gentry v. Export Packaging Co., 238 F.3d 842, 851-52 (7th Cir. 2001) (punitive damages allowed where individual members of

---

[3]The record indicates that the break room in the Racine IHOP may have contained a poster with a hotline for IHOP's "crisis management team." (Smith Dep., Ex. 50.) The poster deals mostly with crises other than sexual harassment, such as food-borne illnesses, crime, injuries, and natural disasters. However, one of the nineteen "crises" listed on the poster is "discrimination claims." Although it is possible that employees could have reported sexual harassment claims using the crisis-management number, the record on this point is too cloudy to allow me to conclude as a matter of law that the availability of the crisis-management hotline entitles defendants to immunity from punitive damages. For example, there is no indication that the crisis management team was affiliated with MHR or Flipmeastack, as opposed to the IHOP franchisor corporation. Further, all Racine IHOP employees testified that Smith was the one to call with harassment claims. Defendants have not suggested that anyone other than the restaurant managers or Smith was available to redress such claims. Additionally, Shaw testified that she reported Hecker's discrimination to "corporate" (the IHOP franchisor corporation) but was referred back to Smith. Finally, I note that the statement that each employee signed after viewing the sexual harassment video instructed them to complain to their "manager" or "company representative," not to any "crisis management team." Similarly, the crisis management poster made no reference to a "company representative."

upper management "failed to address his or her attendant responsibility" under antidiscrimination policy); <u>Hertzberg</u>, 261 F.3d at 664 (company did not engage in good faith efforts to comply with Title VII despite maintenance of sexual harassment policy where evidence showed "lack of managerial response" to harassment).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for partial summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **June 17, 2009 at 2:30 p.m.** to schedule further proceedings. The court will initiate the call.

Dated at Milwaukee, Wisconsin this 27 day of May, 2009.

/s_____
LYNN ADELMAN
District Judge

12