# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
        **Plaintiff,**

    **v.**                          **Case No. 06-C-0715**

**MANAGEMENT HOSPITALITY OF RACINE, INC., et al.,**
        **Defendants.**

---

## DECISION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") brought this action on behalf of two servers, Katrina Shisler and Michelle Powell, who were employed at an IHOP franchise in Racine, Wisconsin (the "Racine IHOP"), alleging that the servers were sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>[1] A jury found that Shisler and Powell's work environment was hostile or abusive and that defendants are liable for this harassment. Before me now are the parties' post-verdict motions.

## I. BACKGROUND

At trial, Shisler and Powell testified that, between February and May of 2005, they were sexually harassed by one of the assistant managers at the Racine IHOP, Rosalio "Junior" Gutierrez. Shisler and Powell testified about numerous instances in which Gutierrez made sexually charged comments and engaged in sexual touching. Shisler and

---

[1]Initially, the EEOC filed this suit on behalf of three servers, but one of the servers, Rachel Schreier, failed to appear at trial, and so the claims filed on her behalf will be dismissed.

Powell testified that they complained about the harassment to both the general manager of the Racine IHOP, Michelle Dahl, and the other assistant manager, Nadia Del Rio, but that no action was taken on their complaints. Shortly after Shisler complained about Gutierrez's behavior, she was terminated for violating the restaurant's policy against possession of coupons while on duty.[2]

Shisler then consulted a lawyer, and this lawyer hired an investigator who began interviewing servers at the Racine IHOP. Del Rio informed the district manager for the Racine IHOP, Steve Smith, about the investigation, and this prompted Smith to conduct his own investigation. By this time, Gutierrez had already quit his job at the restaurant, and so Smith could not take any corrective action against him. However, Smith determined that Shisler and Powell had complained to Dahl and that Dahl should have acted on their complaints. He concluded that Dahl had violated defendants' sexual harassment policy by not investigating the complaints and terminated her on the spot.

The jury instructions and verdict asked the jury to determine whether Shisler and Powell had been subjected to a hostile work environment and whether their employer was liable for failing to prevent or correct the sexual harassment. The jury was also asked to determine whether Shisler was terminated in retaliation for complaining about sexual harassment. The jury found in favor of Shisler and Powell on the sexual harassment claims and in favor of defendants on the retaliation claim. The jury awarded $1,000 in compensatory damages to Shisler and $4,000 in compensatory damages to Powell. The

---

[2]Defendants argued that they prohibited servers from possessing coupons while on duty to prevent servers from handing them out to customers who were otherwise willing to pay full price.

jury also determined that defendants had acted in willful or reckless disregard of Powell's rights and awarded her $100,000 in punitive damages. The jury determined that defendants had not acted in willful or reckless disregard of Shisler's rights and therefore did not award her punitive damages.

There are three defendants in this case. The first is Salauddin Janmohammed, the franchisee of the Racine IHOP and approximately twenty other IHOPs located in the Midwest. Janmohammed was the president and sole shareholder of the second defendant, Management Hospitality of Racine, Inc. ("MHR"), an Illinois corporation that Janmohammed formed in connection with the Racine franchise. After the events giving rise to this suit occurred, Janmohammed sold the Racine franchise to a third party and dissolved MHR. MHR is nonetheless a proper defendant because, under Illinois law, a dissolved corporation can be sued in its own name within five years after dissolution. 805 Ill. Comp. Stat. 5/12.80. The third defendant is Flipmeastack, Inc., an Illinois corporation owned by Janmohammed's wife, Victoria Janmohammed. As explained in more detail below, Salauddin Janmohammed contracted with Flipmeastack to staff and operate all of his IHOP franchises, including the Racine IHOP. The jury instructions and verdict referred to the three defendants collectively and did not ask the jury to apportion liability among them.

The EEOC raises two issues in its post-verdict motions. First, it contends that all three defendants are jointly and severally liable for the claimants' damages. Second, it contends that injunctive relief should be awarded against Flipmeastack and that such relief should extend to all of the IHOP restaurants it manages.

Defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing that no reasonable jury could have found that Shisler and Powell experienced severe or pervasive sexual harassment. Defendants further argue that even if the jury could have found that the claimants' harassment was severe or pervasive, the jury could not have reasonably concluded that defendants had failed to establish their affirmative defense under Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) – i.e., that defendants exercised reasonable care to prevent or correct harassing conduct in the workplace and that the claimants unreasonably failed to take advantage of opportunities and directives provided by defendants to prevent or correct harassment. Defendants also argue that the jury could not have reasonably concluded that defendants' conduct caused Powell $4,000 in compensatory damages, and that the jury should not have awarded Powell punitive damages because defendants engaged in good-faith efforts to implement an antidiscrimination policy. Alternatively, defendants argue that Powell's employer was MHR, and that because MHR had fewer than 100 employees Powell's damages must be reduced to $50,000 pursuant to 42 U.S.C. § 1981a(b)(3). Defendants also move in the alternative for a new trial under Federal Rule Civil Procedure 59 based on two alleged errors: (1) failing to include a specific question on the verdict regarding defendants' Faragher/Ellerth affirmative defense, and (2) admitting evidence regarding harassment claims made by employees other than Shisler and Powell at trial. Finally, defendants move for judgment on the EEOC's unsuccessful claims and to strike certain materials attached to an affidavit filed by the EEOC in support of its post-verdict motion. I consider these issues below.

## II.  DISCUSSION

**A.      Defendants' Motion for Judgment as a Matter of Law or New Trial**

In considering a motion for judgment as a matter of law under Rule 50(b), I must decide whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed.  See, e.g., Wallace v. McGlothan, 606 F.3d 410, 418 (7th Cir. 2010).

### 1.      Whether jury permissibly concluded that claimants experienced severe or pervasive sexual harassment.

Defendants first argue that no reasonable jury could have concluded that Gutierrez subjected Shisler and Powell to severe or pervasive harassment.  "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment."  Scruggs v. Garst Seed Co., 587 F.3d 832, 840 (7th Cir. 2009).  Further, a claim for a hostile work environment must be tested both objectively and subjectively.  Turner v. The Saloon, Ltd., 595 F.3d 679, 685 (7th Cir. 2010).  That is, "the plaintiff must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment."  Id.  Factors that may be considered when making these determinations include "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance."  Scruggs, 587 F.3d at 840.  Offhand comments and simple teasing do not

rise to the level of conduct that alters the terms and conditions of employment.  Id. at 840-41.  However, to be actionable, harassing conduct does not need to be both severe and pervasive; one instance of conduct that is sufficiently severe may be enough.  Jackson v. County of Racine, 474 F.3d 493, 499 (7th Cir. 2007); Cerros v. Steel Techs., Inc., 398 F.3d 944, 950 (7th Cir. 2005).

In the present case, Shisler testified that Gutierrez engaged in sexually harassing behavior "all the time" during the three weeks that she worked for him.  (Trial Tr., Vol. I, at 51.)  At that time, Shisler was eighteen years old and Gutierrez was in his late twenties or early thirties.  Shisler testified that, on several occasions, Gutierrez told her he wanted to take her into the dry storage area of the restaurant and "fuck [her] on the pancake batter." (Id.)  Gutierrez said this in the presence of other employees, as well as in private.  Shisler asked Gutierrez to stop making these comments, but he persisted.  Shisler also testified that Gutierrez stared at her in a sexual manner at least once per shift, and that his staring made her uncomfortable.  She testified that "[h]e'd look me up and down.  He'd look up and down my body.  He always stared at my butt.  He'd stare at my breasts.  He would just stare at me like I was a piece of meat."  (Id. at 55.)  Shisler testified that Gutierrez also engaged in sexual touching.  One night, Shisler was bending over to clean a spill when she heard Gutierrez "talking about [her] butt" to another server.  (Id. at 56.)  Gutierrez then walked up to her and "slap groped" her buttocks, which Shisler described as a slap that turned into a grope.  (Id.)  Shisler told Gutierrez to "get the fuck off of [her]."  (Id. at 156.)  On another occasion, Gutierrez approached Shisler from behind and began massaging her, and Shisler could feel him breathing on her head and neck.  She told him to "get the fuck away from [her]" and to leave her alone, but he refused.  (Id. at 56.)  Gutierrez also

6

remarked to Shisler that his girlfriend would not mind him trying to pick Shisler up because his girlfriend was bisexual and they frequently picked up girls together. On another occasion, Gutierrez told Shisler that he thought she was "kinky" and that she "liked to do it rough." (Id. at 61.)

A reasonable jury could have concluded from the above testimony that Gutierrez's harassment was objectively severe or pervasive. Much of the behavior – including Gutierrez's repeated requests to take Shisler into the dry storage area and fuck her on the pancake batter – was extremely severe. Although the harassing behavior need not be both severe and pervasive, a reasonable jury could have found that the harassment was pervasive in addition to severe. Shisler testified that the harassment occurred on every shift on which Gutierrez was her assistant manager. Defendants point out that, on cross examination, Shisler could tie only three instances of sexual harassment to specific shifts, and they argue that therefore the jury could not have found that Gutierrez harassed Shisler more than three times. As noted, however, on direct examination Shisler identified more than three instances of harassment, and on cross examination she insisted that harassment occurred on every shift. Although she could not remember the exact dates on which the other instances occurred, the jury was entitled to believe that the other instances did, in fact, occur. In any event, the three instances that Shisler could tie to specific shifts – propositioning her for sex on the pancake batter, telling her that she was kinky and liked it rough, and "slap groping" her buttocks – were extremely severe, and given that they occurred within a ten-day time period, could also reasonably be viewed as pervasive.

As for the subjective component, defendants argue that Shisler was not offended by Gutierrez's behavior because she testified that at first she was "flattered" by Gutierrez's

attention. However, Shisler did not testify that any of the above conduct flattered her; rather, she testified that she was flattered when Gutierrez made a comment about liking her tie and her haircut. (Trial Tr., Vol. I, at 203.) Although defendants argued to the jury that Shisler was flattered by some of Gutierrez's harassing behavior, the jury was entitled to believe that Shisler was only flattered by the comments about her tie and haircut, which occurred before the harassing behavior commenced. Defendants also contend that because Shisler had posted some off-color, sexual jokes on the online community "Myspace" (www.myspace.com) she could not have been offended by Gutierrez's harassment. However, sharing jokes with friends in an online community is vastly different than being propositioned for sex by a supervisor at work. Thus, the jury reasonably concluded that Shisler subjectively believed that the harassment was severe or pervasive.

The evidence at trial also allowed the jury to reasonably conclude that Powell had experienced severe or pervasive sexual harassment. Powell, who was nineteen at the time, worked with Gutierrez during certain shifts between February and May of 2005. Powell testified that when Gutierrez first became her assistant manager, she did not have any problems with him, but that as Gutierrez began to engage in harassing behavior, she "became less and less comfortable with him," to the point where she "tried to avoid him at all costs." (Trial Tr., Vol. II, at 218.) Gutierrez's harassment began when he told Powell in the presence of customers and other servers that her "ass looked good in them pants." (Id.) Powell testified that this comment made her feel awkward but that she laughed it off, thinking it was a joke. However, as Gutierrez's harassment became more severe, she realized it was not a joke. Gutierrez began to pull Powell's hair whenever he could and told her that she "liked it rough" and "would get freaky with sex." (Id. at 219.) On another

occasion, he whispered in her ear that he wanted to "eat [her] out," which was a proposition for oral sex. (Id. at 219, 224.) He once left her a voicemail in which he asked if she wanted to "hook up." (Id. at 219.) On one occasion when both Powell and Gutierrez were in the kitchen, Gutierrez told the cooks in Spanish that he wanted to fuck Powell but she would not let him. Gutierrez then translated his statement for Powell and the cooks nodded in agreement. Powell stated that when this happened she felt dirty. Gutierrez also approached Powell when she was in the dry storage area and pressed his pelvis against hers and told her he wanted to "do [her] from behind." (Id. at 221.) On other occasions, Gutierrez walked past Powell and brushed up against her breasts and buttocks. Powell testified that she repeatedly told Gutierrez that his behavior was inappropriate and that he should "knock it off." (Id. at 222.) When Gutierrez continued his harassing behavior, Powell attempted to avoid him, going so far to redirect her walking path if she noticed that Gutierrez was nearby. Based on this testimony, the jury could have reasonably concluded that an objective person would have found Powell's work environment to be hostile or abusive and that Powell subjectively considered her work environment to be hostile or abusive.

### 2. Whether jury permissibly concluded that defendants had not established their Faragher/Ellerth affirmative defense.

Under Faragher and Ellerth, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. However, when no tangible employment action is taken (as in the present case) "a defending employer may raise an affirmative defense to liability or

damages, subject to proof by a preponderance of the evidence." <u>Faragher</u>, 524 U.S. at 807; <u>Ellerth</u>, 524 U.S. at 765. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Faragher</u>, 524 U.S. at 807; <u>Ellerth</u>, 524 U.S. at 765.

In the present case, the jury was instructed to find in favor of defendants on the sexual harassment claims if defendants carried their burden of proof on their affirmative defense. However, the jury returned a verdict in favor of the EEOC, thus finding that defendants had not established their affirmative defense. Defendants argue that no reasonable jury could have failed to find that they had established their affirmative defense. I address each element of the defense in turn.

The first issue is whether the jury could have reasonably concluded that defendants did not exercise reasonable care to prevent and correct promptly any sexually harassing behavior. At trial, defendants attempted to show that they exercised reasonable care by pointing out that they had adopted a policy against sexual harassment and trained their employees about sexual harassment. The training consisted of showing all employees a "sexual harassment video tape" upon the commencement of their employment. (This tape was not shown to the jury or otherwise offered as evidence.) After viewing the video tape, both Shisler and Powell signed a copy of Flipmeastack's sexual harassment policy. The policy instructed employees to "report any instances of improper behavior to [their] manager or company representative." (Defs.' Ex. 1026.) Shisler and Powell testified at trial that they knew they could report sexual harassment to their general manager (Michelle

Dahl), any assistant manager (Gutierrez and Nadia Del Rio), or the district manager (Steve Smith). Defendants also claim that they posted a sign in the employee break room that displayed the district manager's telephone number, but there was conflicting testimony as to whether this sign was actually posted during the time period when Shisler and Powell were being harassed. Finally, defendants point out that once Steve Smith learned that a private investigator was asking questions about sexual harassment at the Racine IHOP, he commenced his own investigation and terminated Michelle Dahl for failing to investigate Shisler and Powell's complaints about sexual harassment.

The jury could have reasonably concluded that defendants satisfied their duty to exercise reasonable care by adopting the sexual harassment policy and complaint mechanism and terminating Michelle Dahl for failing to investigate Shisler and Powell's complaints about sexual harassment. However, I cannot say that the jury was compelled to reach this conclusion. The mere adoption of some sexual harassment policy and complaint mechanism does not establish reasonable care as a matter of law; rather, the policy and complaint mechanism must be reasonably effective. Equal Employment Opportunity Comm'n v. V & J Foods, Inc., 507 F.3d 575, 578-79 (7th Cir. 2007); Loughman v. Malnati Org., Inc., 395 F.3d 404, 407 (7th Cir. 2005). Moreover, it is not enough for the employer to show that it had adopted a policy that looks good on paper; the employer must show that its policy and complaint mechanism were reasonably effective in practice – that is, that they were implemented properly. Clark v. United Parcel Serv., Inc., 400 F.3d 341, 349-50 (6th Cir. 2005) (cited with approval in V&J Foods, 507 F.3d at 579).

In the present case, the jury could have reasonably concluded that defendants' policy and complaint mechanism were not reasonably effective. First, the jury heard

evidence indicating that all managerial employees at the Racine IHOP failed to carry out their duties under the policy, and thus the jury could have concluded that Flipmeastack had not properly trained its managers about preventing and correcting sexual harassment. See Loughman, 395 F.3d at 407 (finding that "the consistent stream of harassment" at an employer's restaurant suggests that employer's anti-harassment policy was "actually not very effective at all"). Gutierrez violated the policy by engaging in sexual harassment. The other assistant manager at the Racine IHOP, Nadia Del Rio, failed to investigate or report Gutierrez's harassment after Shisler and Powell complained to her. Indeed, Del Rio testified that after Powell complained to her, she determined for herself that the alleged harassment was not serious enough to warrant reporting because Shisler and Powell did not appear to be "afraid" of Gutierrez.[3] Likewise, the general manager, Michelle Dahl, failed to investigate and report Gutierrez's harassment after Shisler and Powell complained to her. Further, the jury heard evidence that Smith had failed to act on a prior complaint

---

[3]Del Rio testified as follows:

Q.  You knew that this was a sexual harassment complaint, and sexual harassment complaints are very serious, aren't they?
A.  Yes.
Q.  And you must immediately report sexual harassment complaints, shouldn't you?
A.  Yes.
Q.  But you didn't?
A.  But to me it was not sexual harassment, because they were always talking and laughing. And they never look like they were afraid of [Gutierrez]. They never look like they were afraid of [Gutierrez]. They were always talking, laughing, sitting by him. Anywhere he would go, they were all behind him. So to me it was not sexual. To me it was not like they were scared of him.

(Trial Tr., Vol. II, at 449.)

by Shisler about the sexual harassment of another server, "Kristin," by the Racine IHOP's former general manager, Charles Hecker. The jury also heard evidence that Smith had himself sexually harassed Michele Dahl by rubbing his fingers on the cleavage area of a picture of Dahl's teenage daughter. Gutierrez testified that he witnessed this incident but failed to report it. In light of all this testimony, the jury could have concluded that no one at the Racine IHOP took the sexual harassment policy seriously, and that the supervisors charged with enforcing the policy were poorly trained. See Clark, 400 F.3d at 350 ("The effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it.").

Second, the jury could have concluded that defendants' complaint mechanism was ineffective not just in practice, but on paper as well. The most serious defect was that Flipmeastack included language that could be reasonably understood as discouraging employees from making harassment complaints. After the written policy informs employees that they may complain about harassment to their manager or company representative, the policy states: "I also understand the severity of knowingly making false accusations of discrimination or harassment. Sexual harassment and/or Discrimination are a serious charge and should be taken seriously." (Defs.' Ex. 1026.) Victoria Janmohammed testified that she decided to add this language to the policy after her husband was sued for sexual harassment by a server at one of his other IHOPs. She denied that the language was added as a result of the lawsuit, but because the language was added after the lawsuit was filed the jury could have disbelieved her. In any case, the important point is that employees who read this statement might have been discouraged from making harassment complaints. An employee might have thought that he or she

would be disciplined if Flipmeastack investigated the complaint and determined that it was false. The jury could have concluded that an employer who discourages complaints about harassment in this manner has not exercised reasonable care to prevent and correct harassment.

Finally, although this fact is not itself dispositive, I note that Flipmeastack did not establish any kind of hotline or formal complaint mechanism for reporting harassment claims. Where a large organization such as Flipmeastack employs a substantial number of teenagers, it is not unreasonable to expect the organization to "create a clear path for complaints of harassment and other forms of illegal discrimination." V&J Foods, 507 F.3d at 579. Such a clear path might consist of a hotline posted in the employee break room that can be used to report harassment and discrimination. Id. In the present case, the complaint mechanism was somewhat informal, in that the sexual harassment policy told employees to report claims to their manager or company representative without specifying any particular point person or manner of lodging a complaint. Although defendants claim that they displayed a poster with instructions for reporting harassment claims in the employee break room, there was conflicting testimony as to whether this poster was actually displayed during the time when Shisler and Powell were harassed. In any event, even assuming that the poster was displayed, the jury was entitled to conclude that the poster did not adequately explain the complaint mechanism. The poster is entitled "IHOP Crisis Management Guidelines" and contains instructions for managing natural disasters, fires, and other events such as outbreaks of food-borne illness and armed robbery. (Defs.' Ex. 1050.) The poster instructs employees to proceed in six steps: (1) remain calm, (2) assess the situation, (3) notify authorities, (4) notify the company, (5) proceed as directed

and (6) refrain from commenting to the media.  Oddly, the poster also lists "discrimination claims" as one of the nineteen events for which this six-step process should be used, even though most of the six steps have nothing to do with reporting harassment or discrimination claims.  The jury could have concluded that complaints about sexual harassment and discrimination are significantly different than natural disasters and other similar events, and that, in burying information about the mechanism for reporting discrimination claims on a poster designed for dealing with other crises, defendants did not create a clear path for reporting harassment claims.[4]

Based on the above evidence, the jury could have reasonably concluded that defendants did not exercise reasonable care to prevent and correct promptly any sexually harassing behavior.  For this reason, I need not consider whether the jury reasonably concluded that defendants failed to establish the second element of their affirmative defense – that Shisler and Powell unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendants or to avoid harm otherwise.  Nonetheless, as I explain below, the jury could have reasonably concluded that Shisler and Powell did not act unreasonably.

Defendants argument at trial was that Shisler and Powell acted unreasonably in not reporting Gutierrez's behavior to Steve Smith, the district manager.  Defendants argued

---

[4]Defendants argue that, even if their poster was unclear, Shisler and Powell testified that they understood how to report harassment claims.  Such testimony is evidence in defendants' favor.  However, whether defendants exercised reasonable care is a question that must be answered objectively.  Just as a jury may find that a an employer exercised reasonable care even though it did not succeed in preventing sexual harassment, <u>see Caridad v. Metro-Noth Commuter R.R.</u>, 191 F.3d 283, 295 (2d Cir. 1999), a jury may find that an employer failed to exercise reasonable care even though some of its employees understood its complaint mechanism.

that had Shisler and Powell gone to Smith, he would have conducted an immediate investigation, as evidenced by the investigation he conducted upon learning that a private investigator was asking questions about harassment at the Racine IHOP. However, the jury could have concluded that Shisler and Powell acted reasonably even though they did not complain to Smith. Both Shisler and Powell activated the sexual harassment complaint mechanism by complaining to their "manager or company representative." Besides asking Gutierrez to stop his harassing behavior, Shisler and Powell each reported Gutierrez's harassment to Nadia Del Rio and Michelle Dahl – each of whom were "managers or company representatives" within the meaning of the sexual harassment policy. Shisler first reported Gutierrez's behavior to Del Rio on March 18, 2005, which was only one day after Gutierrez first propositioned Shisler for sex on the pancake batter, and three days after he told her that she was kinky and liked it rough in bed. After Del Rio failed to take action and the harassment continued, Shisler reported Gutierrez's behavior to the general manager, Michelle Dahl, on March 27, 2005. Only a few days later, on April 3, 2005, Dahl terminated Shisler's employment. From this evidence, the jury could have concluded that Shisler acted reasonably and that she was not required to go directly to Smith.

Powell reported Gutierrez's behavior to Dahl during the first week of April 2005. This was about a month after the harassment commenced. Dahl told Powell that the situation "would be taken care of." (Trial Tr., Vol. II, at 225.) The following week, Del Rio approached Powell and asked her if Gutierrez had been harassing her. Powell said that he had been and told Del Rio that she had already complained to Dahl. Finally, in the last week of April, Powell repeated her complaint to Dahl, and Dahl responded by telling her that she knew what Powell was going to say and that she did not need to say it. Despite

these complaints, Gutierrez's harassment continued until he quit his job on May 22, 2005. From this evidence, the jury could have concluded that Powell acted reasonably. Although there was some delay between the time the harassment commenced and the date on which Powell first reported it, the jury was entitled to conclude that the delay was not unreasonable, especially since Powell testified that the harassment became more severe over time. Once Powell reported the harassment to both Dahl and Del Rio and they told her they would take care of it, she had discharged her obligations under the sexual harassment policy. Although Powell might also have complained to Smith once she realized that Dahl and Del Rio had not corrected the problem, only a few weeks had elapsed between the time that Powell complained to Dahl and the date on which Gutierrez left the restaurant. The jury was permitted to conclude that Powell did not act unreasonably in failing to contact Smith during this time period. See <u>Hardy v. Univ. of Ill. at Chicago</u>, 328 F.3d 361, 365 (7th Cir. 2003) (stating that it is for jury to decide whether employee's delay in using employer's complaint mechanism was unreasonable, and that delays of six weeks and three months were not unreasonable as a matter of law).

Accordingly, I conclude that the jury was not required to find that defendants had established their affirmative defense under <u>Faragher</u> and <u>Ellerth</u>.

### 3. Whether defendants are entitled to a new trial because verdict did not contain question on <u>Faragher/Ellerth</u> affirmative defense.

Defendants argue that they are entitled to a new trial because I did not include a question on the verdict asking specifically whether defendants had established their <u>Faragher/Ellerth</u> affirmative defense. They argue that they were prejudiced by this omission and cite cases dealing with a district judge's failure to include a material issue on

a special verdict.  See, e.g., U.S. Fire Ins. Co. v. Pressed Steel Tank Co., Inc., 852 F.2d 313, 316 (7th Cir. 1988).  However, insofar as the verdict pertained to the hostile work environment claims, it was a general rather than special verdict, in that it did not ask the jury to answer interrogatories about each element of the claims and defenses but simply asked the jury whether it found in favor of plaintiffs or defendants.[5]  Thus, cases pertaining to the omission of a material issue from a special verdict are not relevant.

In any event, the verdict and jury instructions were not in any way misleading or prejudicial to defendants.  The jury instructions, which tracked the Seventh Circuit's pattern instructions, explained all of the elements that the EEOC needed to prove in connection with Shisler and Powell's hostile work environment claims.  The instructions told the jury to return a verdict in favor of defendants if it determined that the EEOC had not established all of these elements.  The instructions then stated that if the EEOC had established these elements, the jury was to consider whether defendants had established their affirmative defense.  The instructions told the jury to return a verdict in favor of defendants if it determined that defendants had established both elements of the defense.  Consistently with the instructions, the verdict simply asked the jury whether it found in favor of plaintiff or defendants on each claim.

---

[5]The verdict was a special verdict to the extent that it included interrogatories asking the jury whether claimants were entitled to punitive damages and to separate the amount of compensatory and punitive damages awarded, if any.

**4.      Whether defendants are entitled to a new trial because of admission of evidence regarding sexual harassment of employees other than claimants.**

Defendants next argue that they are entitled to a new trial because I admitted evidence regarding the sexual harassment of employees other than Shisler and Powell. Defendants argue that this evidence was irrelevant because it had nothing to do with whether Shisler and Powell experienced sexual harassment. However, as explained above, evidence of other instances of sexual harassment was relevant to defendants' Faragher/Ellerth affirmative defense because it suggested that Flipmeastack's sexual harassment policy was not reasonably effective. See Loughman, 395 F.3d at 407 (evidence of "consistent stream of sexual harassment" suggests that employer's anti-harassment policy was not effective). Thus, this evidence was relevant.

**5.      Whether jury's award of compensatory damages to Powell was proper.**

Defendants argue that the jury's award of $4,000 in compensatory damages to Powell was improper. Defendants contend that, in awarding this amount, the jury must have awarded damages for emotional distress caused by third parties, including Powell's boyfriend and her father. At trial, Powell testified that when she told her boyfriend about Gutierrez's harassment he became angry and physically assaulted her. Powell also testified that when her father learned about the harassment he became upset over the fact that she would not quit her job. This led to an extended period during which Powell and her father did not speak to one another. Powell's father died in a skydiving accident shortly thereafter. Defendants argue that Gutierrez's harassment cannot be deemed the cause of the emotional distress associated with these two events.

To begin with, it is important to point out that Powell's injuries were not limited to the emotional distress associated with her relationships with her boyfriend and father. Rather, Powell also suffered harm in the form of the humiliation and distress caused by Gutierrez's harassment, such as when he propositioned her for sex, pressed his pelvis against her, pulled her hair, and brushed against her breasts and buttocks. Much of this harassment was severe and occurred in front of other customers and employees, and thus the jury could have reasonably awarded her $4,000 as compensation for humiliation and degradation. Cf. United States v. Balistrieri, 981 F.2d 916, 932 (7th Cir. 1992) (stating that "[t]he more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action").

However, even if the jury considered Powell's relationships with her boyfriend and father when computing her damages, the award would be proper. While it is true that defendants cannot be held liable for any emotional distress caused by Powell's boyfriend's assault or her father's untimely death, the jury could properly consider the strain that Gutierrez's harassment placed on Powell's personal relationships. Considering both the humiliation that Powell suffered as a result of Gutierrez's actions along with the strain it placed on her relationships, $4,000 is not excessive. Further, the jury was not required to precisely determine how much of Powell's distress was due to Gutierrez's harassment and how much was due to her father's death and the actions of her boyfriend. Merriweather v. Family Dollar Stores of Ind., Inc., 103 F.3d 576, 581 (7th Cir. 1996) (stating that jury need not quantify how much psychological distress was caused by defendant's actions rather than other events).

**6.** **Whether jury permissibly awarded punitive damages.**

Defendants next challenge the jury's award of $100,000 in punitive damages to Powell.  A Title VII plaintiff is entitled to punitive damages if the defendant engages in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights."  42 U.S.C. § 1981a(b)(1).  This requires proof that the defendant acted "in the face of a perceived risk that its actions will violate federal law."  Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535-36 (1999).

In the present case, defendants do not dispute that the jury reasonably concluded that Gutierrez acted in the face of a perceived risk that his actions violated federal law. However, Gutierrez's state of mind is not automatically imputable to defendants, and defendants can avoid liability for punitive damages if they establish that they made good-faith efforts to comply with Title VII.  Id. at 545-46.  Here, defendants contend that they made good-faith efforts to comply with Title VII by adopting an anti-harassment policy and complaint mechanism, and that therefore they are immune from liability for punitive damages as a matter of law.

However, the existence of an anti-harassment policy "is not sufficient in and of itself to insulate an employer from a punitive damages award."  Bruso v. United Airlines, Inc., 239 F.3d 848, 858-59 (7th Cir. 2001).  Otherwise, "employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies."  Id.; accord Lampley v. Onyx Acceptance Corp., 340 F.3d 478, 482-83 (7th Cir. 2003); Hertzberg v. SRAM Corp., 261 F.3d 651, 663 (7th Cir. 2001).  Further, the jury could have reasonably concluded that defendants' policy did

not constitute a good-faith effort to comply with Title VII. As discussed above, Flipmeastack's anti-harassment policy included language warning employees about the "severity" of making false charges of discrimination or harassment. Victoria Janmohammed, the president of Flipmeastack and the person with ultimate authority for defendants' policy, testified that she added this language to the policy after her husband was sued for sexual harassment by an employee at one of his other IHOPs. Although Janmohammed denied that she added this language to the policy as a result of the lawsuit brought against her husband, the jury could have reasonably inferred that Janmohammed was upset by this charge and that she wanted to discourage other such claims. Further, the jury could have concluded that the language about making false claims deterred employees from complaining about harassment out of fear that their complaint would be deemed false and that they would be disciplined for making a false claim.

Moreover, the evidence allowed a reasonable jury to conclude that defendants' efforts to educate their managerial employees about sexual harassment were inadequate. As discussed, although Gutierrez, Del Rio and Dahl all testified that they received sexual harassment training, none of them did what the policy required. Gutierrez engaged in harassment himself and failed to report Smith's harassment of Dahl. Del Rio decided that she did not need to take Powell's complaints about Gutierrez's harassment seriously because Powell did not seem to be afraid of him. Dahl ignored numerous complaints about Gutierrez's harassment. The jury could have concluded that this consistent failure of management to fulfill their duties evinced a lack of effort on the part of Flipmeastack to ensure that its managerial employees actually understood what sexual harassment was and what their responsibilities were under the policy.

Finally, the jury could have inferred from defendants' "crisis management" poster that Flipmeastack had made only a half-hearted attempt to comply with Title VII. As noted, defendants held this poster out as their way of ensuring that all employees knew how to report sexual harassment. Yet, the poster is clearly designed to deal with events such as crime, fires and natural disasters rather than complaints of discrimination or harassment. Although the poster does list "discrimination claims" as one of the nineteen events to which it applies, it lists such claims as part of a list of three "other emergencies" – the other two being fires and "labor union intrusion." The jury could have concluded that defendants added "discrimination claims" to this list as an afterthought rather than as part of a good-faith effort to comply with Title VII.

Accordingly, the jury could have reasonably concluded that defendants' efforts to comply with Title VII fell short of the good-faith effort required to avoid liability for punitive damages.

### 7. Whether Powell's damages must be reduced pursuant to statutory cap.

Finally, defendants argue that no defendant employed more than 100 employees and that therefore Powell's compensatory and punitive damages must be reduced to $50,000 pursuant to 42 U.S.C. § 1981a(b)(3)(A). However, as explained below, Powell, along with every other employee under the management of Flipmeastack, was "employed" by Flipmeastack. Because Flipmeastack managed at least 201 employees, the statutory cap is no lower than $200,000. Thus, Powell's compensatory and punitive damages are within the applicable statutory cap and need not be reduced.[6]

_____

[6]Defendants have not challenged the jury's award as excessive as a matter of due process, and therefore I do not consider whether the $100,000 award must be reduced for

**B.**      **Plaintiff's Motion as to Scope of Remedies**

**1.**      **Liability for damages**

The EEOC argues that all three defendants – MHR, Flipmeastack, and Salauddin Janmohammed – are jointly and severally liable for the $105,000 verdict. Defendants argue that MHR is the entity that employed Shisler and Powell and that therefore MHR is the only party liable for the verdict. However, as explained below, Flipmeastack also employed Shisler and Powell, and therefore it is also liable for the verdict. Further, as the recipient of MHR's assets upon dissolution, Salauddin Janmohammed is personally liable for the verdict in the amount of $15,000.

**a.**      **Liability of Flipmeastack**

As noted above, at the time of the events that give rise to this suit, Salauddin Janmohammed owned approximately twenty IHOP restaurants, either personally or through various business entities. He was the franchisee of the IHOP where Shisler and Powell worked. Although the franchise agreement between Janmohammed and IHOP listed Janmohammed, individually, as the franchisee of the Racine IHOP, Janmohammed incorporated MHR in connection with the franchise and became its president and sole shareholder. Janmohammed did not formally assign the franchise to MHR, but it was apparently Janmohammed's intent that MHR be the de facto franchisee.

However, MHR did not actually operate the franchise. Janmohammed delegated that function to Flipmeastack. According to Victoria Janmohammed, Flipmeastack's business consists of providing "management consulting" services to all of the IHOPs

---

reasons other than the statutory cap.

24

owned by Salauddin Janmohammed.  However, "management consulting" is not an apt description of what Flipmeastack does.  Usually, management consultants make recommendations to firms for improving their business, and the firms decide whether to implement the consultants' recommendations.  Flipmeastack does not make recommendations to Salauddin Janmohammed about the operation of his IHOPs; rather, it operates them outright.  That is, when Janmohammed decides to open a new IHOP, he hires Flipmeastack to staff the restaurants and supervise their day-to-day operations without any input from him whatsoever.  Flipmeastack does this through its district managers, each of whom is responsible for several of Janmohammed's restaurants. When Janmohammed opens a new restaurant, Flipmeastack assigns one of its district managers to that restaurant.  The district manager hires and supervises the restaurant's general manager, and the general manager then hires and supervises the assistant managers and remaining employees at each store.  All restaurant-level employees receive their paychecks from the corporation associated with their restaurant (e.g., MHR), while all district managers and higher employees receive their paychecks from Flipmeastack. Although Flipmeastack does not usually hire the assistant managers and servers, it exercises control over them indirectly through general managers, and also directly, in that district managers will often participate in the management of individual restaurants.  At trial, the district manager for the Racine IHOP, Steve Smith, testified that he considered himself the servers' "boss" (Trial Tr., Vol. III, at 539), and stated that he was authorized to hire and fire servers on the spot (id. at 617).

All policies concerning the day-to-day operation of Janmohammed's restaurants – such as employee training, what vendors to use when purchasing food, and store

promotions – are formulated and monitored by Flipmeastack. As explained above, Flipmeastack is also in charge of the sexual harassment policy and complaint mechanism at all of Janmohammed's IHOPs.

The Seventh Circuit has recognized that "multiple entities may be considered an employee's 'employer' for the purposes of Title VII liability." Tamayo v. Blagojevich, 526 F.3d 1074, 1088 (7th Cir. 2008). In the present case, the parties agree that MHR was one of Shisler and Powell's employers. Whether Flipmeastack was also their employer depends on general principles of agency law. See, e.g., Ellerth, 524 U.S. at 754-55. Although a number of factors are normally considered when determining whether an employer-employee relationship exists, under Title VII the pertinent question is whether "the defendant so far controlled the plaintiff's employment relationship that it [is] appropriate to regard the defendant as the de facto or indirect employer of the plaintiff." EEOC v. Illinois, 69 F.3d 167, 169 (7th Cir. 1995). This approach is sensible, because Title VII is concerned with preventing discrimination in the workplace, and the entity with the greatest ability to prevent and correct such discrimination  – i.e., the entity exercising control over the workplace – should be charged with liability for doing so. See Faragher, 524 U.S. at 803 (stating that employer should be held vicariously liable for acts of harassing supervisor because employer has the greatest opportunity to screen supervisors, train them, and monitor their performance); Brewer v. Bd. of Trs. of the Univ. of Ill., 479 F.3d 908, 920 (7th Cir. 2007) (stating that in Title VII context agency principles should be construed in light of practical reason for imposing vicarious liability on employers – to give employers incentive to control their employees).

In the present case, Flipmeastack exercised total control over the employees of the Racine IHOP.  As described above, Salauddin Janmohammed, MHR's president, did not in any way participate in the operation of the restaurant.  Instead, he hired Flipmeastack to do so, which then hired all of the restaurant's employees and supervised their day-to-day activities.  MHR essentially subcontracted responsibility for the Racine IHOP's operations to Flipmeastack, and Flipmeastack then hired employees who were directly answerable to it, even though they received their paychecks from MHR.  Indeed, although paychecks were issued by MHR, it was Flipmeastack that determined how much each employee would be paid, and whether the employee would receive a raise.  Further, Flipmeastack was responsible for administering the sexual harassment and diversity policy at the Racine IHOP, along with all other policies regarding the operation of the restaurant.  Thus, Flipmeastack was an "employer" of Shisler and Powell, even though it did not sign their paychecks.  See Carver v. Sheriff of LaSalle County, Ill., 243 F.3d 379, 382 (7th Cir. 2001) (stating that "the source of funds need not coincide with the identity of the employer," and that an entity can be an individual's "employer" even if it does not supply the funds that are used to pay him or her).  Accordingly, Flipmeastack is jointly and severally liable for the verdict.

Before moving on, I note that the parties had framed the issue of Flipmeastack's liability in terms of Papa v. Katy Industries, Inc., 166 F.3d 937 (7th Cir. 1999), a case in which the Seventh Circuit was asked to disregard the separate corporate existence of several affiliated companies.  The court held that although each separate entity within a set of affiliated companies was entitled to be treated as such, the separate existence of each entity could be disregarded if it would be appropriate to "pierce the corporate veil" or

if the enterprise split itself into separate entities for the purpose of avoided coverage under the antidiscrimination laws.  Id. at 940-42.  The court also recognized that it would be appropriate to hold a parent company liable for the act of its subsidiary if the parent company "directed the discriminatory act, practice, or policy of which the employee of its subsidiary was complaining."  Id. at 941.

Although Papa v. Katy Industries, Inc. has some relevance to the present case, I find that it is not entirely on point.  As discussed, the dispositive issue is whether Flipmeastack was one of Shisler and Powell's employers, an issue not addressed in Papa.  However, Papa has some relevance, in that it serves as a reminder that a company with a distinct corporate existence can be held liable for its own acts.  Id.  Thus, although Flipmeastack is a distinct legal entity, it can be held liable for employing Shisler, Powell and Gutierrez and failing to prevent and correct promptly Gutierrez's sexually harassing behavior.

Flipmeastack argues that it did not "direct" Gutierrez to harass Shisler and Powell, and that therefore the "third situation" from Papa does not apply in this case.  However, in the context of vicarious liability for sexual harassment that does not result in a tangible employment action, an employer's liability does not arise from the employer's affirmative act but from the employer's failure to act – that is, its failure to prevent or correct the discrimination.  Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  In the present case, Flipmeastack's liability does not stem from any corporate affiliation between Flipmeastack, MHR and the Janmohammeds, but from the fact that Flipmeastack had an independent duty to protect its own employees from sexual harassment.  Thus, Flipmeastack's liability is based on its own act, even though it did not direct Gutierrez's behavior.

### b. Liability of Salauddin Janmohammed

The EEOC next argues that I may pierce MHR's corporate veil and hold Salauddin Janmohammed personally liable for the verdict. However, this issue is somewhat moot due to the fact that MHR sold its assets and has been dissolved. Under Illinois law, shareholders of a dissolved corporation become liable for its debts, to the extent of any distributions they received. 805 Ill. Comp. Stat. 5/12.80; Matos v. Richard A. Nellis, Inc., 101 F.3d 1193, 1195 (7th Cir. 1996). Thus, Janmohammed must personally satisfy any judgment against MHR to the extent of the distributions he received from MHR.

The parties dispute the amount that Janmohammed received when he dissolved MHR. The EEOC contends that Janmohammed received $210,000, the amount that the buyers paid for MHR's assets. Janmohammed contends that he is only liable up to $15,000, since that is the extent of the cash he received from the asset sale. The EEOC seems to concede that Janmohammed did not receive more than $15,000 in cash. However, the EEOC contends that, as part of the sale, the buyers of MHR's assets agreed to assume $195,000 worth of Janmohammed's personal liability to the IHOP corporation. There is some confusion in the record as to whether the assumed liability was the corporation's liability or Janmohammed's personal liability. There is also some confusion over exactly what MHR's assets consisted of. The primary asset was the franchise itself, but the franchise was in Janmohammed's name, not MHR's. On this record, it is impossible to conclude whether Janmohammed received more than $15,000 from the sale of MHR's assets. Because the EEOC has the burden of proof and has not demonstrated by the preponderance of the evidence that Janmohammed received more than $15,000

in distributions from MHR, I determine that the EEOC can collect no more than $15,000 from Janmohammed.[7]

## 2. Injunctive Relief

Title VII allows a court to award injunctive relief when it finds that the defendant "intentionally engaged in or is intentionally engaging in an unlawful employment practice." 42 U.S.C. § 2000e-5(g)(1). The court may enjoin the unlawful employment practice and also "order such affirmative action as may be appropriate." Id. The decision of whether to invoke injunctive relief is within the district court's discretion, as is the scope of any equitable relief awarded. Bruso, 239 F.3d at 863; EEOC v. Gurnee Inn Corp., 914 F.2d 815, 817 (7th Cir. 1990). In deciding whether to award equitable relief, I am bound by the jury's factual findings on plaintiff's legal claims but may make additional findings of fact as needed. Lebow v. Am. Trans Air, Inc., 86 F.3d 661, 672-73 (7th Cir. 1996); Avitia v. Metro. Club of Chicago, Inc., 49 F.3d 1219, 1231 (7th Cir. 1995).

In the present case, the jury found that defendants intentionally engaged in an unlawful employment practice, and so injunctive relief is authorized. EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1578 (7th Cir. 1997). However, the claimants no longer work for defendants and do not intend to seek future employment at any of their restaurants. Nonetheless, the EEOC requests injunctive relief against Flipmeastack in order to ensure that current and future employees of the restaurants under Flipmeastack's control do not become victims of sexual harassment. In this regard, the EEOC requests an order (1) enjoining Flipmeastack from allowing or failing to promptly prevent and correct

---

[7]I also note that the EEOC did not request an evidentiary hearing on this issue.

sexual harassment of its employees; (2) requiring Flipmeastack to create a new sexual harassment training program for all employees that emphasizes management's responsibility to prevent and correct sexual harassment; (3) requiring Flipmeastack to post a toll-free number for making sexual harassment complaints at all of the restaurants under its control; (4) requiring Flipmeastack to report any complaint of sexual harassment to the EEOC within thirty days and provide a description of the complaint, the investigation that was conducted, and the result of the complaint; (5) requiring Flipmeastack to post a notice regarding this case at all restaurants under its control; and (6) requiring Flipmeastack to maintain records of its compliance with the injunction and to allow the EEOC access to these records on forty-eight hours' notice.

Even though the claimants no longer work for defendants, I conclude that injunctive relief is appropriate because the problems that led to the present suit could possibly persist in the future.  See Ilona of Hungary, 108 F.3d at 1578-79 (injunctive relief is warranted when "discriminatory conduct could possibly persist in the future").  As discussed above, in finding defendants liable for the claimants' hostile work environment and awarding Powell punitive damages, the jury implicitly found that defendants' anti-harassment policy, training and complaint mechanism were deficient.  Insofar as the jury's findings are not comprehensive, I also find that defendants' efforts to prevent and correct promptly any sexually harassing behavior are deficient.  As noted, the policy itself, in warning employees about the severity and seriousness of sexual harassment allegations, seems to discourage harassment complaints and gives the impression that an employee will be disciplined if his or her complaint is not sustained.  Further, the "crisis management" poster does not clearly explain Flipmeastack's sexual harassment complaint mechanism.  Finally, based on the

31

testimony at trial, I find that Flipmeastack's managerial employees do not understand their duties under the sexual harassment policy. The EEOC's requested injunction is intended to address these deficiencies, and therefore I conclude that the injunction is warranted. See Gurnee Inn, 914 F.2d at 817 (affirming entry of injunction intended to address deficiencies in employer's anti-harassment policy and grievance procedure).

Defendants argue that injunctive relief cannot extend to the other IHOPs owned by Salauddin Janmohammed and managed by Flipmeastack because they are separate entities and not parties to this case. However, the EEOC asks that the injunction be directed to Flipmeastack, and as explained above, Flipmeastack exercises functional control over all of the restaurants owned by Janmohammed. It is Flipmeastack that supervises all employees at Janmohammed's restaurants and administers the anti-harassment policy and complaint mechanism. Thus, it is Flipmeastack's employment practices that need to be corrected, and so the injunction is appropriately addressed to it.

Defendants contend that Flipmeastack has no authority to, among other things, post notices about the present lawsuit in Janmohammed's restaurants. This would be true if Janmohammed's restaurants terminated their contracts with Flipmeastack and no longer relied on it for management services. However, so long as those restaurants contract with Flipmeastack and delegate control over the workplace to it, Flipmeastack has authority to post the notices required by this injunction, just as it had authority to post the "crisis management" guidelines at the Racine IHOP.

**C.    Miscellaneous Motions**

Two remaining motions filed by defendants require brief discussion.    First, defendants move for judgment on Shisler's retaliation claim, which the jury rejected, and on the claims of Rachel Schreier, the claimant who did not appear at trial.    To the extent that defendants request an order recognizing that Shisler's retaliation claim was unsuccessful and that Schreier's claims have been dismissed, the motion is granted. However, to the extent that the motion requests entry of a separate judgment on those claims, the motion is denied because the general rule is that when an action presents multiple claims for relief all such claims should be resolved in one final judgment, see, e.g., Dale v. Lappin, 376 F.3d 652, 654 (7th Cir. 2004), and there is no reason to enter a separate judgment in this case.    Further, to the extent that the motion requests costs in connection with the unsuccessful claims, the motion is denied because defendants are not "prevailing parties" within the meaning of Federal Rule of Civil Procedure 54(d)(1). Prevailing party status is not awarded on a claim-by-claim basis.    Slane v. Mariah Boats, Inc., 164 F.3d 1065, 1068 (7th Cir. 1999).    Rather, the prevailing party is the party who obtains substantial relief, even if that party did not win on every claim.    In the present case the prevailing party is clearly the EEOC.

Second, defendants move to strike certain materials that the EEOC included in its affidavit in support of its post-verdict motion.    These materials were not offered as evidence at trial, and defendants contend that for this reason I may not consider them in connection with the present motions.    However, the EEOC submitted these materials to support its equitable claims – claims for which I am the finder of fact.    Of course, defendants are

entitled to contest the facts and to insist that I resolve any factual disputes at an evidentiary hearing. But I did not find it necessary to consult the disputed materials, and so no evidentiary hearing was required. Defendants' motion to strike will therefore be denied as moot.

## III. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that the EEOC's post-trial motion is **GRANTED**.

**IT IS FURTHER ORDERED** that the clerk of court enter judgment in favor of the EEOC and against defendants jointly and severally in the amount of $105,000, provided that the EEOC shall recover no more than $15,000 from Salauddin Janmohammed.

**IT IS FURTHER ORDERED** that the clerk of court enter the injunction attached to this order as Attachment A.

**IT IS FURTHER ORDERED** that defendants' motion for judgment as a matter of law and alternative motion for a new trial is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for entry of judgment and costs regarding the EEOC's unsuccessful claims is **GRANTED IN PART** and **DENIED IN PART**, as explained above.

**FINALLY, IT IS ORDERED** that defendants' motion to strike is **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin this 31 day of August, 2010.

/s_____
LYNN ADELMAN
District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**
        **Plaintiff,**

    **v.**                            **Case No. 06-C-0715**

**MANAGEMENT HOSPITALITY OF
RACINE, INC., d/b/a INTERNATIONAL
HOUSE OF PANCAKES, FLIPMEASTACK,
INC., and SALAUDDIN JANMOHAMMED,**
        **Defendants.**

---

## INJUNCTION AGAINST FLIPMEASTACK, INC.

Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq</u>., the court imposes the following injunctive provisions against Flipmeastack, Inc. ("Flipmeastack") for four years from the date hereof:

1.      Flipmeastack is enjoined from allowing a sexually hostile work environment to exist at any restaurant under its management.

2.      Flipmeastack is ordered to create a new sexual harassment training program for all employees under its direct or indirect supervision that emphasizes the responsibility of supervisors to prevent and correct promptly and sexually harassing behavior.  Further, Flipmeastack is ordered to post, at all restaurants that it manages, a toll-free number for harassment and discrimination complaints by employees and a written anti-harassment and anti-discrimination policy.

3.      Within thirty (30) days after entry of this order, Flipmeastack shall provide counsel for the EEOC with a proposal for complying with Paragraph 2, above.  The EEOC shall advise the company within thirty (30) days of receipt whether the proposal is acceptable. If the EEOC finds the proposal acceptable, Flipmeastack shall implement it within thirty (30) days of the EEOC's approval.   If the EEOC find the proposal unacceptable, it shall identify any deficiencies and make recommendations for correcting them.   Flipmeastack will then have ten (10) days to accept or reject the EEOC's recommendations.  If Flipmeastack rejects the recommendations and the parties cannot settle their differences within ten (10) days after Flipmeastack communicates its rejection, either party may make a motion to the court for a decision on the proposal.

4.      Flipmeastack shall post the attached Notice informing employees of this order in a conspicuous location where such Notice can be easily seen by all employees.

5.      Flipmeastack shall report to the EEOC within thirty (30) days of any complaint of sexual harassment at any restaurant subject to its management and provide the EEOC with a description of the complaint, the investigation that was conducted, and the result of the complaint.

6.      Flipmeastack shall maintain records of its compliance with the foregoing and shall allow the EEOC access thereto on forty eight (48) hours' notice to Flipmeastack.

_____        Jon W. Sanfilippo

_____

Date                                    Clerk


_____

(By) Deputy Clerk


Approved as to form this __ day of August, 2010.


_____

LYNN ADELMAN
District Judge

**Notice to all employees of IHOP restaurants operated by Flipmeastack, Inc.**

Flipmeastack, Inc., an operator of IHOP restaurants owned by Salauddin Janmohammed, in a lawsuit brought by the United States Equal Employment Opportunity Commission (EEOC), has been found by a federal jury to have violated Title VII of the United States Civil Rights Act of 1964 by allowing a sexually hostile work environment. The jury awarded a total of $5,000 in compensatory damages to two victims and $100,000 in punitive damages to one of them.

As a result of this lawsuit, the United States District Court for the Eastern District of Wisconsin has placed Flipmeastack, Inc., under an injunction for four years requiring that it not allow a sexually hostile work environment at its IHOP restaurants.

This notice is a reminder that employees have a right to be protected from sexual harassment in the workplace, and may complain of such unlawful discrimination both internally and to the EEOC.

The EEOC enforces the federal laws against discrimination in employment on the basis of race, color, religion, national origin, sex, age or disability. If you believe you have been discriminated against, you may contact the EEOC at (312) 353-8195. The EEOC charges no fees and has a TTD number.

<u>THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE</u>

This Notice must remain posted for four years from the date below and must not be altered, defaced or covered by any other material. Any questions about this Notice or compliance with its terms may be directed to: EEOC, 500 West Madison Street, Suite 2800, Chicago, IL 60661.

Dated: _____          _____

**Lynn Adelman**
**United States District Court Judge**